**UNITED STATES of America**

v.

**AMERICAN STORES COMPANY, a corporation, Isadore Shocket, an individual trading as Empire Jobbing House, Albert Klaff, an individual, Rivolanne, Inc., a corporation, Sol Sacks, an individual, and Frank LoCastro, an individual.**

**Cr. A. No. 24945.**

United States District Court
D. Maryland,
Criminal Division.
May 20, 1960.

Leon H. A. Pierson, U. S. Atty., Wm. J. Evans, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

J. Cookman Boyd, Jr., Baltimore, Md., for American Stores Co.

Harry Adelberg, Baltimore, Md., for Shocket and Klaff.

Harvey Rosenberg, Washington, D. C., for Rivolanne and LoCastro.

CHESNUT, District Judge.

The Criminal Information in this case charged that the six named defendants "unlawfully caused to be introduced and delivered for introduction into interstate commerce, at Baltimore, Maryland, for delivery to Washington, District of Columbia, a number of jars" of adulterated food, containing "decomposed apple sauce", on or about October 15, 1958.

The three defendants first named, American Stores Company, Isadore Schocket, trading as Empire Jobbing House, and Albert Klaff, by counsel, respectively filed pleas of nolo contendere which were accepted by the Court (District Judge Watkins), and were respectively fined in varying amounts. The remaining three defendants, Rivolanne, Inc., a corporation, Sol Sacks and Frank LoCastro, respectively by their counsel when arraigned, pleaded "not guilty" and were tried by a jury. The verdict of the jury as to Sacks was "not guilty" but "guilty" as to Rivolanne and LoCastro. At the trial counsel for the defendants filed a motion for a directed verdict of acquittal which was denied and after the verdict counsel for LoCastro and Rivolanne have renewed their motion for a directed verdict of acquittal or in the

alternative for a new trial. After careful consideration of the oral arguments and briefs of counsel on the latter motion, I have concluded that both motions should be and they are hereby *overruled*. I will state my reasons therefor as succinctly as possible.

The Information was based on title 21 U.S.C.A. §§ 331 and 333(a) which are the same, with only slight immaterial verbal changes due to codification, as §§ 301 and 303(a) of the Food & Drug Act of 1938. 52 Stat. ch. 675, p. 1040. Section 331(a) to (n) states respectively the acts which are prohibited. Subsection (a) provides:

"(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded".

And section 333(a) provides the penalty for violation of any of the several prohibited acts listed in section 331 as follows (in part):

"Any person who violates any of the provisions of section 331 shall be guilty of a misdemeanor and shall on conviction thereof be subject to imprisonment for not more than one year, or a fine of not more than $1,000, or both such imprisonment and fine."

The principal legal defense urged by counsel for the defendants is his contention that an exception to be found in section 333(c) (1) is applicable to this case. That section reads:

"(c) No person shall be subject to the penalties of subsection (a) of this section, (1) for having received *in interstate commerce* any article and delivered it or proffered delivery of it, if such delivery or proffer was made in good faith, unless he refuses to furnish on request of an officer or employee duly designated by the Secretary the name and address of the person from whom he purchased or received such article and copies of all documents, if any there be, pertaining to the delivery of the article to him;". (Italics supplied.)

Counsel for the Government contends, I think correctly, that this subsection 333(c) (1) is not applicable under the facts of this case. Very briefly stated, the controlling facts shown by the evidence are these:

The American Stores Company has a branch office or factory at Hurlock, Dorchester County, Maryland, where, among other things in October 1958, it manufactured or produced a large quantity of apple sauce. On or about October 15, 1958, it sold and delivered 1,500 cases of this product bearing its brand name "Acme Ideal" to Isadore Shocket, trading as the Empire Jobbing House, in Baltimore, Maryland, for $1 per case, a price substantially less than the current market price for such apple sauce. The invoices described the produce sold as "spots of mold in jars". Shortly thereafter Shocket, an "odd lot jobber", sold 400 cases of the product to Rivolanne whose vice president was LoCastro, and the latter with another officer of Rivolanne, transported the 400 cases to their warehouse in Washington, D. C., and thereafter sold and delivered the much greater part of the 400 cases to other purchasers. The price paid by Rivolanne to Shocket was 25 cents below the usual market price. Klaff was an employee and relative of Shocket. There was conflict in the evidence as to whether LoCastro knew at the time of the purchase that the apple sauce was moldy. There was evidence from which the jury could find and probably did find that the effect of the mold was to cause decomposition or rotting of the apple sauce which made it adulterated within the meaning of the statute. There was also evidence from which the jury could find that the apple sauce was adulterated in the sense mentioned at the time it was transported from Baltimore to Washington. On inquiry from the Federal Investigator, the defendants furnished to him the name and address of Shocket, their vendor, but did not have and could not furnish a

written guaranty of purity as to the apple sauce required as a defense to the prosecution for violation of § 331(a) (the one involved in this case), as provided for in § 333(c) (2), hereafter to be particularly noted.

■ It will be noted that the exception relied on by counsel for the defendants by its terms applies only where the adulterated food has been *"received in interstate commerce"*. The defendants contend that the facts stated show that the defendants did receive the apple sauce in interstate commerce. I do not think so. The apple sauce was produced in the State of Maryland and was sold by the American Stores Company in Maryland to Shocket in Baltimore City, Maryland. An attempt was made by the defendants' counsel to show that some of the 1,500 cases of apple sauce sold by the American Stores to Shocket was at some time produced outside of Maryland and shipped into Maryland, but he did not succeed in showing this on the evidence. He also contends that Shocket knew that Rivolanne intended to transport the 400 cases of apple sauce that it bought, from Baltimore to Washington and there was evidence to that effect; but if so, I do not think that alters the case because the sale by Shocket to Rivolanne was not conditioned upon that disposition, and more particularly, Rivolanne and its officers were charged with the violation of section 331(a) prohibiting the transportation in interstate commerce. The knowledge by Shocket that Rivolanne and LoCastro would transport the adulterated food product out of the State of Maryland was not a defense to the charge against them of unlawful interstate transportation. It is inferable that in accepting the plea of nolo contendere by Shocket the facts shown at the hearing before Judge Watkins also made Shocket responsible for the charge against him jointly with other defendants. But that is not the question now involved as to Rivolanne and LoCastro.

■ Counsel for the defendants also contend that the defendants acted in good faith in purchasing the apple sauce in that there was evidence by them (although disputed by Shocket) that they did not know the apple sauce was moldy but on the contrary had been assured by Shocket that it was "perfect". And for that reason they requested the Court to instruct the jury that if the jury found the defendants acted in good faith, that was a defense to the charge. I declined to give that instruction because it was not necessary for the Government to prove that the defendants knew or must have known that the apple sauce was adulterated. That has been authoritatively decided to the contrary by the Supreme Court of the United States in the case of United States v. Dotterweich, 1943, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48, and no later case to the contrary has been found. Furthermore, the defense of "good faith" by the defendants is relevant as to guilt rather than as to the sentence, only if section 333(c) (1) is applicable.

■ The Government's contention, which I think correct, is that in construing the whole of §§ 331 and 333, in their legislative history, Congress clearly intended the exception in § 333(c) (1) to be applicable only to a case where the defendant was charged under § 331, subsection (c) which reads as follows: "The following acts and the causing thereof are hereby prohibited: * * * (c) The receipt in interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise." It is to be noted that the exception in § 333(c) (1) is couched in the precise language of the offenses prohibited in § 331(c). I think the tendency to confusion arises from the fact that looking at the whole of §§ 331 and 333 it will be found that the exceptions are directly related not to the particular numerous separate offenses described in § 331, but to the penalty section in 333(a). I think the proper construction will appear even more clearly when the whole of the Food & Drug

Act of 1938 is looked at as it appears in the original statute to be found in 52 Stat. ch. 675, p. 1040.

The limited applicability of the exception relied on by the defendants (§ 333 (c) (1)) is made clearer by reference to the remainder of § 333 which, it will be noted, has other stated exceptions with regard to offenses described in subsections (a) and (d) of § 331, and also other exceptions of offenses described in § 331(b) (c) or (k). With reference to the exception specifically applicable to a violation of § 331(a) (introduction into interstate commerce which is the one here charged) the exception reads:

> "(c) No person shall be subject to the penalties of subsection (a) of this section * * * (2) for having violated section 331(a) or (d) of this title, if he establishes a guaranty or undertaking signed by, and containing the name and address of, the person residing in the United States from whom he received in good faith the article, to the effect, in case of an alleged violation of section 331(a) of this title, that such article is not adulterated or misbranded, within the meaning of this chapter designating this chapter or to the effect, in case of an alleged violation of section 331(d) of this title, that such article is not an article which may not, under the provisions of section 344 or 355 of this title, be introduced into interstate commerce;".

In the instant case the defendants, when the adulterated food product was found in their possession, did furnish the Government's agent with the name and address of Shocket, their vendor, but they did not have any guaranty as to the quality of the food from any one in the United States, and particularly not from the American Stores which produced the product.[1]

The exception in § 333(c) (1) would seem to apply in cases where a person has received an "original package" from some other person in another State, and not to a case where a person in a particular State buys the article from another person in the same State. This is well illustrated in the only case which I have found dealing with exception in § 333(c) (1) where, under the facts, the exception was held applicable. United States v. Bess J. Levine, C.C.H. Fed. Food, Drug & Cosmetic Law Reporter, Fed.Rulings & Cases, April 1946—April 1950, p. 7096 (D.C.E.D.Pa.1948, District Judge Welch).

The only other judicial decision construing the proper application of § 333 (c) (1) that I have found is United States v. Parfait Powder Puff Co., 7 Cir., 1947, 163 F.2d 1008. In that case the defendant, Parfait Company, charged under § 333(a) with introducing a prohibited article in interstate commerce, engaged the Helfrich Laboratories to prepare the article, a hair lacquer, furnished most of the materials therefor with containers and addresses for inter-

---

1. Counsel for the Government says that this limited application of the exception in § 333(c) (1) to a charge of violation of § 331(c) has been the consistent contention of the Government with respect to the Food & Drug Act of 1938 for many years past. And in support of this they have shown me the Government's brief for the appellee in the case of Sullivan v. United States, 5 Cir., 1947, 161 F. 2d 629, where the legislative history of § 333(c) (1) was quite fully discussed. It is said that it first appeared in an amendment to the Food & Drug Act of 1906 in an Act of the 73rd Congress in 1934, and after criticism by the Government the original language was somewhat revised when it was enacted in 1938 as § 333(c) (1). In the Sullivan case (United States v. Sullivan, 1948, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297) the defendant was charged with a violation of subsection (k) of § 331 (alteration or removal of a label), was convicted in the district court but the Court of Appeals for the 5th Circuit reversed and the Government appealed to the Supreme Court where the Court of Appeals was reversed. It is said that the defendant relied at the trial in particular on the exception in § 333(c) (1), but abandoned that contention prior to the hearing in the Supreme Court.

state shipment by the Helfrich Company. The latter, apparently without knowledge of the Parfait Company, included in the manufacture of the hair lacquer, a deleterious substance. A defense of the Parfait Company was that § 333(c) (1) applied, contending that in the circumstances the delivery by Helfrich to a common carrier was in effect a receipt of the article by the Parfait Company. The Court denied the application of § 333(c) (1) holding that the Parfait Company was responsible for the interstate shipment by its agent the Helfrich Company, although the substitution of the deleterious substance was unknown or at least not authorized by Parfait. While the facts are different from those of the instant case, the opinion of the Court by District Judge Lindley is most helpful in determining the intent of Congress as to the application of § 333 (c) (1). In the course of his opinion relating particularly to that section, it was said: *"It is clear that it was designed to protect innocent dealers who receive goods shipped in interstate commerce.* Thus, in Senate Report No. 493, 73d Cong. 2d Sess., accompanying S. 2800, the Senate Committee reported as follows: " 'The existing law provides for a guaranty whereby a dealer who buys on faith may be protected from liability under the law. This provision has safeguarded innocent dealers and has been extremely useful in fixing responsibility on guilty shippers. It would be continued in effect by paragraph (c). The bill affords in this paragraph *further protection to the innocent dealer who distributes goods he has received from interstate sources.* If he has failed to secure a guaranty he can escape penalties by furnishing the records of interstate shipment, thus allowing the prosecution to lie solely against the guilty shipper.' It is clear, we think, that the Act was intended to furnish protection to innocent receivers of goods shipped to them in interstate commerce in violation of the Act and not to consignors of such goods, such as defendant." (Italics supplied.)

I have carefully considered the legal contention of defendants' counsel in his brief. He cites in support of his contention, in addition to the Parfait case above mentioned (which I think supports the Government's contention rather than his), two cases: United States v. Sanders, 10 Cir., 1952, 196 F.2d 895 and Drown v. United States, 9 Cir., 1952, 198 F.2d 999. These two cases support the proposition that a vendor in one State who sells to a purchaser an adulterated article with the knowledge that the purchaser will forthwith transport it to another State, is liable to prosecution under § 331(a); and to this effect they are relevant with respect at least to Shocket, the defendants' vendor; but they do not in any way tend to exculpate the defendants who themselves actually transported the adulterated product interstate.

Finally, it should be said that § 333(c) (1) here relied on is an *exception* to the general scheme of the Food & Drug Act which for the protection of the public against impure foods, drugs and cosmetics was mainly designed to prohibit interstate transportation of adulterated food or related products. It is a well-known rule of construction that even in a criminal case where what is only an exception is relied on as a defense, it must be clearly established to be allowable. The defendants argue that the evidence as a whole was insufficient to establish the fact that the apple sauce was moldy when bought in Baltimore by the defendants; but I think it sufficient to say that I found there was evidence legally sufficient to go to the jury to establish the fact.

For these reasons I have concluded that the motion for a directed judgment of acquittal or in the alternative for a new trial must be and is hereby *overruled* this 20th day of May, 1960. The discussion of the motion has been largely related to the proper construction of the provisions of the statute as a matter of law. On the alternative motion for a new trial I do not find any sufficient grounds to allow that as a matter of discretion.